**HOROWITZ et al. v. KAPLAN et al.**

**In re WALTHAM WATCH CO.**

No. 4598.

United States Court of Appeals
First Circuit.

Nov. 29, 1951.

Writ of Certiorari Denied March 3, 1952.

See 72 S.Ct. 561.

Milton Pollack, New York City (Charles W. Bartlett, Boston, Mass., Bernard E. Singer and Richard F. Wolfson, New York City, and Ely, Bartlett, Thompson & Brown, Boston, Mass., on brief), for appellants.

Jacob J. Kaplan, Boston, Mass. (Daniel J. Lyne and C. Keefe Hurley, Boston, Mass., on brief), for Trustees, appearing *pro se*, appellees.

LaRue Brown, Boston, Mass. (Harold P. Seligson, New York City, on brief), for Common Stockholders (Hudson Committee).

Roger S. Foster, General Counsel, David Ferber, Washington, D. C., and George Zolotar, Special Counsel, New York City, and Robert L. Randall, Attorney, Washington, D. C., submitted on brief of Securities and Exchange Commission as amicus curiæ in opposition to motion to dismiss.

Before MAGRUDER, Chief Judge, and WOODBURY and HARTIGAN, Circuit Judges.

MAGRUDER, Chief Judge.

Appellants, as beneficial owners of 510 shares of common stock of the debtor, Waltham Watch Company, bring this appeal from an order of the United States District Court for the District of Massachusetts entered July 27, 1951, confirming a plan of reorganization under Chapter X of the Bankruptcy Act, 52 Stat. 883, 11 U.S.C.A. § 501 et seq.

A motion to dismiss the appeal was filed by appellees, on the ground that these appellants had no standing to challenge the plan of reorganization. In a brief amicus curiae filed by the Securities and Exchange

Commission in opposition to this motion, the Commission contends that appellees have advanced too narrow a construction of the wording of the statute.

■■ The outstanding shares of capital stock are held in a voting trust, pursuant to an earlier plan of reorganization, consummated in 1949, under which old stock and debentures of the debtor company were to be exchanged for voting trust certificates in the reorganized company. Section 206 of the Act provides that "any creditor or stockholder of the debtor shall have the right to be heard on all matters arising in a proceeding under this chapter"; and the right to be heard, thus conferred, includes the right to appeal. In re Keystone Realty Holding Co., 3 Cir., 1941, 117 F.2d 1003, 1005, 133 A.L.R. 1378; Dana v. S.E.C., 2 Cir., 1942, 125 F.2d 542. No doubt voting trust certificate holders of record are entitled to be heard, for § 106 of the Act defines "stock" as including "membership, shares, and similar interests in a debtor, certificates and other evidences of such membership, shares or interests, and voting-trust certificates".

In an order entered May 1, 1951, approving the plan, the district court prescribed that the action of stockholders of the debtor in accepting or rejecting the plan shall be determined by the action of a majority in interest of those voting trust certificate holders "who are such of record at the close of business June 12, 1951" and who shall file with the reorganization trustees their respective claims of interest on or before June 14, 1951. The order further provided that a holder of unexchanged old stock or debentures of the debtor should not be admitted to file proof of claim or interest or an acceptance or rejection of the plan "until such holder shall have exchanged the certificates for such old stock or said debentures for Voting Trust Certificates" as provided in the earlier plan of reorganization.

Two of appellants herein are persons who acquired voting trust certificates in July, 1950, but who have ever since held them in street names. A third appellant holds old stock of the debtor which under the earlier plan of reorganization was to be exchanged for voting trust certificates representing common stock in the reorganized company, an exchange which the holder is still entitled to effectuate, no time limitation having been provided. Appellants, who had on July 20, 1951, filed affidavits of ownership and objections to the plan, were in fact heard by the district court in opposition to the plan at the hearing on confirmation held July 27, 1951, despite challenge by the reorganization trustees of their right to be heard.

■ We agree with the Commission that § 206 of the amended Bankruptcy Act was intended by Congress to eliminate procedural barriers to full participation in the reorganization proceedings by interested persons. The word "stockholder" in § 206, especially in view of the very broad definition of the word "stock" in § 106, should not be read narrowly as being confined to stockholders of record or voting trust certificate holders of record, but should be held to include also beneficial owners of voting trust certificates, such as these appellants, who are real parties in interest. Such broader construction is more in harmony, we think, with the provisions of § 165 of the Act. Accordingly we deny the motion to dismiss the appeal.

■■ In so ruling on the motion to dismiss, we do not mean to suggest that the district court exceeded its discretionary power in its order of May 1, 1951, limiting the voting on the plan to those holders of voting trust certificates who were such of record on June 12, 1951, and who filed their votes on acceptance or rejection on or before June 14, 1951. As a matter of administrative convenience in polling the stockholder interest, it was desirable for the reorganization trustees to have a sharp and clear rule for determining eligibility to vote, instead of having to pass on possibly numerous and doubtful claims of beneficial interest. These appellants were afforded ample opportunity to qualify themselves to vote on the plan. But though they failed to participate at that stage of the proceedings, it was proper for the district court, as it did here, to admit them to participation

at the hearing on confirmation of the plan, having satisfied itself of the authenticity of their claims to be beneficial holders of stockholder interests.

This brings us to a discussion of the merits of the appeal.

Waltham Watch Company is an old and established Massachusetts corporation engaged in the business of manufacturing and selling jeweled watches, parts, and other timing instruments. During the two World Wars the debtor played an important part in manufacturing timing and precision mechanisms for this country and its allies, and as found by the district court "its business is regarded by those charged with the duty of providing for the defense of the United States as being essential for that defense".

In the latter part of 1948 the company found itself in financial difficulties, and filed in the court below a debtor's petition for reorganization under Chapter X. The court approved the petition and appointed three wholly disinterested persons as reorganization trustees. The trustees engaged a leading firm of industrial engineers to survey the operations, management and prospects of the company. Upon the recommendation of this firm the trustees employed as sales manager Mr. Teviah Sachs, an experienced and competent person who had been associated with the watch business as merchandiser and manufacturer for more than thirty years. They also employed Mr. Gilbert Sachs, a brother of Teviah, and likewise a man with long experience in the watch business. Since 1949 the Sachs brothers have been actively associated in managing the business of the debtor; and later events have indicated beyond question that their employment was a fortunate choice.

A plan of reorganization was confirmed on June 10, 1949, and consummated the following September 23, under which the company's indebtedness was reduced by about $5,000,000 and it was recapitalized, all of its stock (about 1,200,000 shares of common, out of 5,000,000 authorized, par value $1.00 per share) being placed in the voting trust. As part of the plan, the debtor received from Reconstruction Finance Corporation a loan in the sum of $4,000,000 secured by mortgages upon all the debtor's real and personal property and a factor's lien upon the debtor's inventory and the proceeds thereof under Mass.G.L. (Ter. Ed.) Ch. 255, §§ 40–47, as added by St.1945, c. 285, together with an assignment of all notes and accounts receivable and trade acceptances owned by the debtor on September 21, 1949, or thereafter acquired. By the terms of the factor's lien agreement, the debtor was permitted until default to sell its merchandise in the usual course of business. The RFC under the powers conferred collected the accounts receivable and placed the same in a so-called cash collateral account, from which it doled out or "reloaned" to the debtor from time to time certain sums as working cash.

There was apparently a misunderstanding between RFC and the management, as a result of which the reorganized company based its business plans upon an expectation of getting a further loan of $3,000,000 which it believed RFC had agreed to grant. The company made formal application to RFC for this additional loan in October, 1949. The loan was not forthcoming, though notification of RFC's final refusal was not made until February 3, 1950. The company then, finding itself with a heavy inventory and no cash, was forced to shut down.

Meanwhile, on January 23, 1950, Waltham Watch Company had failed to pay an installment of interest in the sum of $13,333.33 on the note to RFC, and also had failed to make a monthly tax deposit of $2,700.00 pursuant to the loan agreement. Though at this date RFC held in the so-called cash collateral account the sum of approximately $350,000, arising from the collection of the debtor's accounts and notes receivable, RFC declared the loan in default and the entire indebtedness immediately due and payable and took possession of all the debtor's plant, machinery, fixtures, equipment, materials and supplies.

Later on the same day, February 3, 1950, the company, in what might then have seemed a move of desperation, filed in the court below a new petition for reorganization under Chapter X, the petition now

pending. The district court was hesitant to approve the petition, coming as it did so soon on the heels of the prior reorganization. RFC was insisting that the assets of the company were not sufficient in value to pay RFC's claim; that there was nothing available for unsecured creditors or stockholders; and that it should be permitted to foreclose on its security as soon as possible. It therefore declined to permit the resumption of any manufacturing operations at all. The market quotation on the New York Curb Exchange of the voting trust certificates for the debtor's stock had dropped to 25 cents a share.

Notwithstanding the dismal prospects, however, the district court, on February 28, 1950, finally accepted the petition for reorganization, expressing the opinion that there was a "chance, even though remote, that the company could be successfully reorganized; that the causes which had led to the breakdown after the first reorganization were not irremediable; that the company was an important economic factor in the City of Waltham; and above all that it was highly essential as a link in the national defense at a time when war clouds were gathering." The three persons who had served as disinterested trustees in the earlier reorganization proceeding were persuaded to accept appointment again as reorganization trustees.

The district court fixed a time limit upon the submission of the proposed plans of reorganization. After the operations shut down on February 3, 1950, Teviah Sachs, although he received no compensation, and had no stock interest, devoted practically all of his time in an effort to effect a reorganization and a reopening of the plant, still having faith in the company's long-term prospects. In these efforts he was assisted by his brother Gilbert, working in cooperation with a stockholders' committee trying to find persons interested in investing in the company. Plans for reorganization were submitted to the court by Frederic C. Dumaine, Sr., and Frederic C. Dumaine, Jr., by Allen B. Gellman and Norman B. Schreiber, and by Bulova Watch Company. None of these plans involved any assurance of the return of the company to its stockholders with their equity salvaged.

The Dumaine proposal was to guarantee the payment of $2,000,000 of the RFC loan, the whole amount of which was to remain outstanding as a secured loan at 4 per cent interest for a period of eight years. Dumaine was to have an option, exercisable within three years, to acquire three fourths of the common stock of the company at $1.00 per share; meanwhile all of the stock was to be held in a voting trust controlled by the Dumaines.

Under the Gellman proposal, the RFC loan was to be extended for a long period; Messrs. Gellman and Schreiber were to hold all the common stock of the reorganized company; and the old stockholders were to receive 75 cents par value of non-voting, non-cumulative 4 per cent preferred stock of the reorganized company for each share of common stock. Gellman also proposed to advance by way of secured loans $1,000,000 for working funds.

The Bulova proposal, like the others, called for a long-term extension of the RFC loan. It further proposed to take over all of the debtor's stock, offering therefor its own stock of a market value of $600,000, or 50 cents a share for the 1,200,000 shares of stock in the debtor company. Having thus taken over the company, Bulova contemplated the investment of $1,400,000 in preferred stock.

In the meantime Sachs had worked unsuccessfully to find outside persons willing to invest new money in the company on terms more favorable to the company and its stockholders. Finally, on his own behalf, he offered to invest $100,000 in order to get the company reorganized and reopened. Sachs' proposal, made to the stockholders' committee through the voting trustee, and approved by them, was, with modifications, adopted by the reorganization trustees as their own plan of reorganization, and submitted to the court on May 15, 1950. The main features of this trustees' plan will be stated later in this opinion.

The four plans above mentioned came on for hearing before the district court on

June 20, 1950. The position of RFC at this time was in opposition to each of the four plans on file. On June 30, 1950, the district court filed a memorandum stating that the company "is a solvent concern with a very heavy inventory, but is unable to do business because of the lack of capital"; that this inventory, estimated to be worth between $3,000,000 and $4,000,000 "must be liquidated whether there is a reorganization or not"; that the debtor "has somewhere in the vicinity of $500,000 in cash in local banks in a blocked account under the control of the Reconstruction Finance Corporation"; that the trustees' plan of reorganization, as amended, "is fair, equitable, and feasible and, if successful, will insure the return of the Company to its present owners, the stockholders"; that success of the approved trustees' plan would be assured if RFC would release to the trustees the blocked cash account.

Also on June 20, 1950, the district court held a hearing on a petition by the debtor and the voting trustee of the debtor's common stock, seeking interim authority in the trustees to take possession of the debtor's property and to operate the business, with special reference to the completion and sale of unfinished movements then in inventory. On July 10, 1950, the court filed its findings of fact and order granting this petition. The full text of these findings and order is contained in our opinion in R.F.C. v. Kaplan, 1 Cir., 1950, 185 F.2d 791, and will not be repeated here. The order directed RFC to turn over to the trustees possession of all the debtor's property and authorized the trustees to process and sell the inventory, RFC's lien to be transferred to the net proceeds. The order also authorized the trustees to employ Teviah Sachs to direct the operations of the debtor's business and to pay him compensation at the rate of $25,000 per year.

RFC appealed from this order of July 10, 1950. On August 7, 1950, this court denied an application by RFC for a stay of the order pending appeal. We affirmed the order of the district court on December 21, 1950. R.F.C. v. Kaplan, 1 Cir., 185 F.2d 791.

While this appeal was pending, the trustees took over possession of the plant inventory, but RFC persisted in refusal to relinquish the half million dollars then held by it in the so-called cash collateral account. Something had to be done promptly if the inventory was to be processed in time for sale during the forthcoming Christmas season. Mr. Sachs stepped into the breach at this point by advancing $50,000 cash against trustees' certificates and by persuading prospective customers to advance $600,000 against open orders, also apparently on the security of trustees' certificates. Under the able direction of Sachs, a working force was reassembled, the uncompleted watches in inventory were processed, and cash sales of approximately 150,000 watches brought in the sum of $3,200,000 at an operating cost of about $600,000, thus leaving a net cash amount of $2,600,000.

As a result of the foregoing favorable events, the trustees were enabled finally to effect an agreement with RFC on January 18, 1951, later approved by the court, under which the RFC loan was reduced to the sum of $1,500,000 by payments on account, the balance of the loan being extended to December 31, 1960, secured solely by a mortgage on the plant, machinery, equipment, good will, trade-marks and patents of the debtor. RFC surrendered to the trustees the sum standing in the so-called cash collateral account, and a half million dollars thus became available as working cash.

Under the original plan of reorganization submitted by the trustees, it had been proposed that the inventory be processed and sold and that $2,000,000 be paid on account of the RFC claim, the balance of $2,000,000 to be extended for a 15-year period. The other provisions of the trustees' plan, which have particular bearing on this appeal, were all designed to insure to the reorganized company a reasonable period of stable and experienced management under the direction of Teviah Sachs. At or prior to the date of confirmation of the plan, Mr. Sachs was to enter into a 5-year employment contract as general

manager of the debtor at a salary and upon terms to be approved by the reorganization trustees, the voting trustee, the RFC, and the court, prior to consummation. Mr. Sachs was to pay in the sum of $100,000 for preferred stock of the debtor, entitled to $100,000 on liquidation, and enough common stock to equal one fourth of the total amount of common stock outstanding upon consummation of the plan; and at the end of the first year in which the debtor should make net earnings of at least $100,-000, Mr. Sachs agreed to pay in an additional $200,000 for preferred stock entitled to $200,000 on liquidation, and enough common stock to make Mr. Sachs' total holding of common stock one third of the outstanding common stock.

In view of the interim processing and sale of the inventory, as above stated, the trustees filed amendments of their plan as of April 16, 1951. These amendments made appropriate changes in the plan to reflect the agreement which had already been entered into with RFC on January 18, 1951. RFC is the only secured creditor. All unsecured creditors whose claims have been proved and allowed will be paid in full within 60 days after consummation. In view of the greatly improved prospects of the company, the trustees, with the consent of Mr. Sachs, made changes in the provisions for the issuance of stock to him. It was concluded that the issue of preferred stock was undesirable, and the Messrs. Sachs agreed to accept 400,000 shares of common stock for their initial payment of $100,000. 350,000 of these shares were to be subject to various restrictions on sale or voluntary transfer. Existing shareholders were given an option to purchase 400,000 shares of common stock at par, one share of the new common stock for each three shares of old common stock represented by voting trust certificates. It was provided that Mr. Teviah Sachs would enter into a contract with the debtor to act as its general manager, and that Mr. Gilbert Sachs would enter into a similar contract to act as manager of the watch division, both full-time, for a term of five years; such employment to be upon terms to be approved by the court prior to

confirmation of the plan. As part of their employment contracts, Teviah Sachs was to be granted an option to purchase an additional 235,000 shares of common stock, and Gilbert Sachs 115,000 shares, at any time prior to the expiration of four years and a half from the time when their employment shall have commenced, the price per share to be 95 per cent of the fair market value of the shares at the time the option was granted. As found by the district court, if present market prices prevail this would give the company about $700,000 for these shares upon exercise of the option, instead of the $200,000 provided for in the original plan; a change which was "clearly to the advantage of the company." It was further provided in the amended plan that the voting trust of the common shares was to continue until one year after the date of consummation.

On April 25, 1951, the district court referred the amended plan to the Securities and Exchange Commission, pursuant to §§ 172 and 173 of the Bankruptcy Act. The Commission notified the court that it elected not to file a report on the amended plan, it having previously elected not to file a report on the original plan.

On May 1, 1951, the district court entered its order finding that the trustees' plan of reorganization, as amended, is in all respects in compliance with the Act and is "fair, equitable and feasible". The order gave formal approval to the plan and provided that the text of the plan and an approved summary thereof, together with the court's memorandum opinion, should be submitted to all creditors and voting trust certificate holders for approval or rejection. This summary fully and fairly stated the provisions of the plan having reference to Teviah and Gilbert Sachs, concluding with the following: "Treating the ownership by Mr. Teviah Sachs and Mr. Gilbert Sachs as a single ownership called Sachs, if all of the 400,000 shares of stock which may be purchased by certificate holders is purchased by them and Sachs purchases the 400,000 shares hereinabove described, Sachs will be the owner of 400,-000 shares out of approximately 2,000,000 shares; that is to say, approximately 20%.

If all of the 400,000 shares are purchased by the other certificate holders and Sachs puchases 400,000 shares and exercises the option to acquire 350,000 shares and no other shares are issued, then Sachs will be the owner of 750,000 shares out of a total of approximately 2,350,000 shares, or approximately 32%."

A hearing on final confirmation of the plan was held July 27, 1951. At the last minute, these appellants appeared as the sole objectors to the plan, though they had apparently taken no previous part in the reorganization proceedings. They came into the hearing on confirmation with an offer to purchase 150,000 shares at $1.00 a share. The trustees reported to the court that the holders of certificates for 401,618 shares had assented to the plan and the holders of certificates for 9,141 shares had voted against the plan, the majority in favor of the plan thus being more than 97 per cent of those who exercised the privilege of voting. At this hearing the trustees also submitted for approval of the court their recommendations for the terms of the employment contracts between the debtor and Teviah Sachs and Gilbert Sachs, as provided in the plan. The recommendation was that Teviah Sachs would receive a basic salary of $30,000 per annum, and 6 per cent of the net earnings of the company after taxes, not to exceed $60,000 in any year; that Gilbert Sachs was to receive a salary of $12,000 per annum, and 4 per cent of the net earnings after taxes, not to exceed $40,000 for any one year.

The district court on July 27, 1951, entered an order approving the terms of employment of the Sachs brothers as recommended by the trustees. On the same day it entered the order now appealed from confirming the trustees' amended plan of reorganization.

■■ If the words "fair and equitable, and feasible" in §§ 174 and 221(2) of Chapter X are to be taken in their broad general meaning, and if the confirmed plan of reorganization is not in conflict with some hard and fast rule of law, it is clear to us that the order of the district court should be affirmed. The determination of the district court as to the fairness of the plan will not be set aside unless clearly shown to be erroneous, for the reasons stated in Badenhausen v. Guaranty Trust Company of New York, 4 Cir., 1944, 145 F.2d 40, 53, 54.

This is not a case where a security holder with a certain "nuisance value" because of his power to delay consummation of a reorganization through protracted litigation has driven a hard bargain for a position in the reorganized company to the substantial prejudice of senior interests. If any security holder, or group of security holders, including these appellants, had come forward in the spring of 1950 with a feasible plan of reorganization, involving a commitment to invest substantial new money in the debtor company, Sachs as an outsider could not have delayed one day the approval and consummation of such a plan. But at that time, when the outlook was dim and discouraging, Sachs was the only person willing to agree to invest new money in the company in conjunction with a long-term contractual obligation to contribute his managerial skill, while assuring retention by the stockholders of their equity in the reorganized company. It was not until July 27, 1951, at the hearing on confirmation, after the trustees' plan had been approved by the court and accepted by the overwhelming vote of the stockholder interest, that these appellants appeared with an offer to invest $150,000 in stock of the debtor. By that time, due to the combined efforts of the reorganization trustees and Sachs, aided by orders of the reorganization court, the debtor's heavy inventory had been processed and sold, the greater part of the debt to RFC had been paid off, agreement had been reached with RFC for an extension of the balance, and the future prospects of the debtor looked favorable, as evidenced by the rise in the market price of the voting trust certificates from 25 cents a share in February, 1950, to $2.00 a share on July 27, 1951. Appellants' belated offer on that date, be it noted, was to purchase 150,000 shares of common stock for $1.00 per share, or one half its then market price.

It is beside the point to argue that Sachs was not actuated by selfless altruism in his

efforts to put the company on its feet. When he offered to play the important part in the trustees' plan of reorganization, he no doubt saw a chance to make a good thing for himself if his estimate of the future prospects of the debtor should prove to be more far-sighted than the then current pessimistic judgment of the stock market. But because he had this faith in the company, and was willing to back it up, the trustees were enabled to present to the court a feasible plan of reorganization, absent which the court presumably would have dismissed the Chapter X proceeding under § 236 of the Act, leaving RFC free to realize upon its security, in forced liquidation, with little or nothing left for the stockholders. Sachs, in other words, played a vital part in preserving the debtor's going concern value, to the aggrandizement of these appellants as well as the other stockholder interests.

It is true that, when the reorganization proceeding developed to the point that RFC was placated and agreed to release its strangle hold on the debtor, the most pressing need for putting through a plan of reorganization no longer existed. Appellants say it would have been in order then for the court to dismiss the Chapter X proceeding. So it might, if the debtor, which had filed the petition for reorganization, had then applied to have the proceeding dismissed. But the debtor, the voting trustee of the common stock, and a protective committee representing the great majority in interest of the voting trust certificate holders, did not want the proceeding dismissed. They continued to work with the reorganization trustees and with Sachs in order to accomplish the pending trustees' plan of reorganization, and they have appeared in this court as appellees in support of the district court's order of confirmation. It was evidently their judgment, as it must have been that of the court in approving and confirming the plan, that by consummation of the plan the debtor would emerge from the Chapter X proceedings with enhanced prospects of success due to the assurance of experienced and stable management to be contributed by Sachs, and that this anticipation of increased future earnings would naturally be reflected in a rise in the going-concern value of the debtor and in the value of the stockholder interests. On the record before us, we cannot say that this judgment is lacking in rational basis or that the confirmed plan of reorganization would not be to the best interest of all concerned. The judgment of the market seems to be in accord, for the market price of the voting trust certificates has continued to rise with the increasing prospect of consummation of the plan of reorganization; according to appellants' brief, the market price of the certificates had risen to $3.00 at the time of the hearing before us.

■ Of course, such a judgment is not predicated upon the mathematical exactness of a valuation of assets appearing in the balance sheet, but involves an estimate or prediction of future earnings of the debtor under expectable business conditions and with the favoring circumstances of a stable and experienced management. See Consolidated Rock Products Co. v. Du Bois, 1941, 312 U.S. 510, 526, 61 S.Ct. 675, 85 L.Ed. 982. What it would be worth to the debtor to have the long-term management of Sachs, as provided in the plan, if expressed in terms of a dollar figure, would merely give the illusion of certainty to what is essentially a matter of forecast based upon imponderable factors. In determining the fairness of the plan in this respect, considerable weight should be given to the collective judgment of the stockholder group, who are most vitally concerned, and with whom these appellants, minority stockholders with insignificant holdings, are associated in a common interest.

We do not understand appellants to contend that the trustees' plan was not fair and equitable under the circumstances prevailing when the plan was first submitted in the spring of 1950. At that time Sachs had sufficient faith in the company to risk his reputation in the industry by signing a five-year employment contract. No one other than Sachs came forward with a proposal so favorable to the stockholders, and the stockholder interest which he was to acquire would not be worth anything to

him unless he succeeded in putting the company on a profitable basis. Representatives of the RFC warned Sachs at that time that he was simply pouring his money "down a sewer" and had a "hole in his head" besides.

There may well be cases where a plan of reorganization, fair and equitable when first proposed, has because of supervening events become unfair and inequitable when the plan is up for the final confirmation; but this is not such a case. In R.F.C. v. Denver & Rio Grande Western R. R. Co., 1946, 328 U.S. 495, at page 521, 66 S.Ct. 1282, at pages 1296, 1384, 90 L.Ed. 1400, a railroad reorganization case under § 77 of the Bankruptcy Act, 11 U.S.C.A. § 205, the Court said: "Assuming that the courts, as courts with equity powers in a bankruptcy matter, might set aside a plan, fair and equitable when adopted by the Commission, merely on account of subsequent changes in economic conditions of the region or the nation, it should not be done when the changes are of the kind that were envisaged and considered by the Commission in its deliberations upon or explanations of the plan."

To the same effect see Insurance Group Committee v. Denver & Rio Grande Western R. R. Co., 1947, 329 U.S. 607, 611–612, 67 S.Ct. 583, 91 L.Ed. 547. In the present case it is clear that the district court, when it initially approved the plan, anticipated that the successful liquidation of the heavy inventory, and the reduction of the RFC debt to a manageable amount, would remove the chief obstacle to the resumption of successful operations by the debtor after release from control of the bankruptcy court. The court was undoubtedly aware of the company's earning experience during World Wars I and II. Opportunity for profitable business from future conversion to defense production of precision instruments was regarded not only as a possibility, but was indeed a primary reason why the petition for reorganization had been approved by the district court. The greatly improved prospects of the company as of the date of the hearing on final confirmation of the plan came as no surprise to the district court, but was the hoped-for result of the factors above mentioned. There would be little or no incentive for persons to come forward with long-chance commitments in aid of a corporate reorganization when the outlook is cloudy and uncertain, if the very success of the venture is taken as ground for denying its fruits to the one who is willing to make the speculation. Cf. Morrison v. Burnette, 8 Cir., 1907, 154 F. 617, 625; Clamitz v. Thatcher Mfg. Co., 2 Cir., 1947, 158 F.2d 687, 693.

That the brothers Sachs, if they should in the future exercise their option to purchase an additional 350,000 common shares of the debtor corporation, will eventually acquire 32 per cent of the common stock, which may give them practical voting control, is not a valid objection to the plan so far as these appellants are concerned. Holding as they do only a minute stockholder interest, they obviously will not be displaced from control by the operation of the plan. At present, the control of the debtor is in the hands of a voting trustee, under a voting trust agreement which by its terms RFC is entitled to insist shall continue in force until its claim is finally satisfied in full. Under the plan, the voting trust is to terminate one year after its consummation. The predominant judgment of the stockholder interests, other than appellants', is that prospect of this acquisition by Sachs of an important proprietary interest in the company is all to the good, as furnishing assurance of the Sachs management even beyond the five-year contract period under a direct incentive to promote the success of the company in every possible way.

Notwithstanding the persuasive force of the foregoing considerations, it is the contention of appellants that the plan of reorganization is fatally defective in that it is in contravention of an inflexible rule of law—the so-called "absolute priority rule" attributed to Northern Pacific Ry. Co. v. Boyd, 1913, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931, an equity receivership case, and held to be implied in the "fair and equitable" standard of old § 77B, 11 U.S.C.A. § 207, and its successor, Chapter X, by decisions of the Supreme Court in Case v. Los

Angeles Lumber Products Co., Ltd., 1939, 308 U.S. 106, 60 S.Ct. 1, 84 L.Ed. 110, and Consolidated Rock Products Co. v. DuBois, 1941, 312 U.S. 510, 61 S.Ct. 675, 85 L.Ed. 982. The facts of those cases were quite unlike the case at bar, and we do not understand them as intending to lay down a rigid rule of such wide application as to forbid the type of reorganization proposed under the circumstances of the present case.

In the Los Angeles Lumber Products case, supra, the Supreme Court disapproved a plan of reorganization of an insolvent corporation under § 77B, under which the old stockholders, though they no longer had any equity in the assets of the enterprise, were given 23 per cent of the assets and voting power in the reorganized company without making any fresh contribution of capital. The Court held that the creditors of the company were entitled to absolute priority over the stockholders and that this meant that any participation by the stockholder in the reorganized company "must be based on a contribution in money or in money's worth, reasonably equivalent in view of all the circumstances to the participation of the stockholder." 308 U.S. at page 122, 60 S. Ct. at page 10. In the Consolidated Rock Products case, supra, the absolute priority rule was held to be applicable to a reorganization of a solvent corporation. A plan of reorganization was disapproved under which the subordinate rights of the stockholders were attempted to be secured in the reorganized company at the expense of senior creditor interests for which full compensatory provision was not made for the entire bundle of rights which they were called upon to surrender; the new securities offered to the creditors were not of a value equal to the creditors' claims surrendered.

In the present case, no claims of creditors are involved. The stockholder interest is no doubt senior to that of Sachs, who stands as an outsider prior to consummation of the plan. But nothing is proposed to be taken from the stockholders in the reorganization of the company. They are to retain in full their present holdings, represented now by voting trust certificates, and they are under the plan to be given the right to subscribe on favorable terms to a new issue of 400,000 shares of common stock on the basis of one share of new common for each three presently held shares of voting trust certificates. There is to be issued to Sachs, for the agreed price of $100,000, 400,000 new shares of common stock, an issue well within the presently authorized limit of 5,000,000 shares of common stock as provided in the debtor's charter. The Sachs brothers are also to be given an option to subscribe to an additional 350,000 shares of common stock at 95 per cent of whatever is the fair market value of said shares at the time the plan is consummated—but this option will be of no worth to Sachs unless, under his management, the company is maintained in prosperous condition. As above stated, it must have been the judgment of the stockholders, in approving the plan and of the district court in finding it to be fair and equitable and confirming it, that this proposed acquisition of common stock by Sachs would not dilute the value of the existing stockholder interest but would, upon the contrary, in conjunction with provisions of the plan to insure continuance of the able management by Sachs, enhance the value thereof.

It is true that in the Los Angeles Lumber Products Company case an argument was advanced, more or less as an afterthought, in justification of stockholder participation in the reorganized insolvent company, that it was to the advantage of the senior creditor interest, which had not received a full equivalent for the claims surrendered, to preserve the going value of the debtor company under the old, experienced stockholder-management. But it is to be noted that the stockholder participation in the reorganized company was not limited to those stockholders who were actually part of the management, as the Supreme Court pointed out; and further, that the plan did not insure continuance of the old management group, for there was no contractual commitment by the shareholders who may have been previously contributing to the management to remain in that capacity. The

Supreme Court rejected the argument, holding that such vague hopes or possibilities could not be the basis for the issuance of stock to otherwise valueless interests. The Court's reason for rejecting the argument may perhaps be gleaned from the footnote in the opinion by Mr. Justice Douglas, 308 U.S. at page 123, 60 S.Ct. at page 11, as follows:

"On comparable facts a like conclusion was reached in Re Barclay Park Corp., 2 Cir., 90 F.2d 595, where the court said, page 598:

" 'It is argued that the stockholders represent the present management of the hotel and that the management is valuable and indeed necessary to the enterprise and that the manager-stockholders will "walk out" if the proposed plan does not go through and leave the hotel to its fate. But there is no binding agreement on their part to remain which might afford a justification for giving them a stock interest and, if their managerial skill is vital to the success of the hotel, any stock issued to insure the continuance of their relation ought to go to those stockholders who are of use to the enterprise and agree to act in its behalf, and not to all stockholders as such. Indeed, the supposed advantages of retaining the existing management seem to be a matter of inference, if not of speculation, supported by the oral statements of attorneys instead of by testimony.' "

In the present case, by contrast, the new stock interest is to be sold only to Teviah Sachs and his brother, whose continued management of the debtor company is deemed to be an important assurance of its future success, and the Sachs brothers have bound themselves by contract to remain in the management positions for a five-year period. How far it is deemed expedient to bid for the loyalty and continued services of key executives by offering them stock options on favorable terms is a common problem of corporate management normally within the discretion of the board of directors, to be exercised in good faith. See Baker, Stock Options for Executives,

19 Harv.Bus.Rev. 106, 109 (1940). We do not believe that Congress, in enacting Chapter X, intended to preclude the possibility of including such sensible business arrangements as part of a plan of reorganization, especially when the overwhelming majority in interest of the stockholders approve of such a plan. See Securities and Exchange Commission v. United States Realty & Improvement Co., 1940, 310 U.S. 434, 454, 60 S.Ct. 1044, 84 L.Ed. 1293.

The order of the District Court is affirmed.