455 F.2d 811
 In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.
Appeal of the NEW YORK, NEW HAVEN & HARTFORD RAILROAD
COMPANY FIRST MORTGAGE 4% BONDHOLDERS COMMITTEE.
 No. 19503.
 United States Court of Appeals,
Third Circuit.
 Argued Nov. 9, 1971.
Decided Jan. 27, 1972.
 
 Lester C. Migdal, Migdal, Low, Tenney & Glass, New York City, for appellant.
 Walter J. Myskowski, Washington, D. C., for appellee.
 Before VAN DUSEN and JAMES ROSEN, Circuit Judges, and LAYTON. District Judge.
 OPINION OF THE COURT
 VAN DUSEN, Circuit Judge.
 
 
 1
 This case involves an appeal by the New York, New Haven & Hartford Railroad Company First Mortgage 4% Bondholders Committee ("the New Haven Committee") from an order of the District Court for the Eastern District of Pennsylvania sitting as a Reorganization Court In the Matter of Penn Central Transportation Company, Debtor. The order in dispute, Order No. 63, resulted from a petition filed on September 11, 1970, by the Penn Central Trustees, requesting authority to affirm a Memorandum of Intent with the New York Metropolitan Transportation Authority ("the MTA") and the Connecticut Transportation Authority ("the CTA"). This Memorandum provided for the sale to the MTA of the Penn Central line between Woodlawn Junction and Port Chester in New York (a line formerly owned and operated by the New York, New Haven & Hartford Railroad Company ("the New Haven"))[1] and a 60-year lease to the CTA of the Penn Central lines extending from the New York-Connecticut boundary to the Connecticut cities of New Haven, Waterbury, Danbury and New Canaan (lines also formerly owned and operated by the New Haven).[2] A hearing on the Trustees' petition was held on September 23, 1970, by the Penn Central Reorganization Court. The Trustee of the New Haven and the New Haven Committee appeared at this hearing to object to the conveyances contemplated by the Memorandum unless the Penn Central Trustees deposited with the Indenture Trustees of a Penn Central Divisional First Mortgage[3] an amount in cash equal to the fair value of the properties transferred, not simply the cash which Penn Central was to receive in direct payment for the transfers.[4] After some discussion, the hearing was recessed to allow the parties to effect a compromise.
 
 
 2
 A settlement agreement reached between all the participants except the New Haven Committee was reflected in Order No. 63 of the Penn Central Reorganization Court, dated September 29, 1970. This order authorized the Penn Central Trustees to affirm the Memorandum, but reserved jurisdiction to determine the valuation and disposition of the consideration to be received by the Trustees from the MTA and the CTA.[5] Paragraph 4 of the order, however, appears to limit the Penn Central Trustees' obligations to the New Haven Trustee under the Divisional First Mortgage.[6] The New Haven Committee objected to the entry of this order, largely because of the limitation contained in paragraph 4.[7] This appeal followed.[8]
 
 
 3
 A threshold issue in this appeal involves the authority of the New Haven Committee to appeal the entry of Order No. 63 by the Penn Central Reorganization Court.[9] For the reasons to be stated, we conclude that the New Haven Committee is not authorized by the controlling bankruptcy statutes to prosecute this appeal. We therefore grant the motion made by the Penn Central Trustees to dismiss the appeal.[9]
 
 
 4
 The standing of a participant to a railroad reorganization to appeal from an order of the reorganization court turns on whether Section 77(c) (13) of the Bankruptcy Act, 11 U.S.C. Sec. 205(c) (13) (1964), grants him a right to be heard.[10] See Horowitz v. Kaplan, 193 F.2d 64, 66 (1st Cir. 1951); In re Keystone Realty Holding Co., 117 F.2d 1003, 1005 (3d Cir. 1941). Section 77(c) (13) grants this right to be heard to the "debtor, any creditor or stockholder."[11] Thus the New Haven Committee is authorized to bring this appeal only if it is a "creditor" or a "stockholder" of the Penn Central as these terms are defined in the Bankruptcy Act.[12]
 
 
 5
 The New Haven appears to argue that it is a "creditor" of the Penn Central because of the very substantial interest which its members have in the property which the New Haven Trustee receives from the Penn Central. The members of the New Haven Committee are the holders of New Haven First Mortgage 4% Bonds which were outstanding at the time that the assets and operations of the New Haven were sold to Penn Central on December 31, 1968.[13] The transfer of assets to Penn Central, however, was made free of this mortgage lien, with the lien attaching to the proceeds of the sale held by the New Haven Trustee.[14] Thus the New Haven bondholders represented by the Committee have a lien on substantially all of the assets held by the New Haven Trustee, including the Penn Central 5% Divisional First Mortgage Bonds.[15] These New Haven bondholders, therefore, have a substantial derivative interest in assuring that the terms of the mortgage which secures these bonds are complied with. Put in the simplest terms, the more cash that is deposited with the Mortgage Indenture Trustees when former New Haven assets are sold, the more likely it is that the Penn Central's obligations to the New Haven Trustee will be met, and therefore the more likely it is that the New Haven Committee bondholders will have their claims against the New Haven satisfied.
 
 
 6
 The relevant language of the Bankruptcy Act indicates, however, that Congress did not intend that those with simply a derivative interest in a railroad reorganization proceeding have a right to be heard and to appeal. See Callaway v. Benton, 336 U.S. 132, 139, 69 S.Ct. 435, 93 L.Ed. 553 (1949); Boston & Providence Railroad Stockholders Development Group v. Smith, 333 F.2d 651 (2d Cir. 1964). Cf. Peckham v. Casalduc, 261 F.2d 120 (1st Cir. 1958).[16] Section 77(b) of the Act, 11 U.S.C. Sec. 205(b), provides as follows:
 
 
 7
 "The term 'creditors' shall include, for all purposes of this section all holders of claims of whatever character against the debtor or his property . . . ." (emphasis added.)
 
 
 8
 This record requires the conclusion that the members of the New Haven Committee do not hold claims against either the Penn Central or the property of the Penn Central, as required by the language of Section 77(b). The lien which these New Haven bondholders once had on the New Haven property (some of which Penn Central has transferred to the MTA and the CTA pursuant to Order No. 63) was explicitly released when this property was transferred to Penn Central on December 31, 1968.[17] Furthermore, the lien which the New Haven bondholders have against the proceeds of the sale to Penn Central[18] does not give them a claim against the Penn Central. The claim against the Penn Central for these proceeds is held by the New Haven Trustee; the New Haven bondholders have a claim only against the amounts which the New Haven Trustee receives from Penn Central. Thus, since the members of the New Haven Committee do not have claims either against Penn Central property or against the Penn Central, they are not "creditors" of Penn Central within the applicable language of the Bankruptcy Act and, therefore, had no automatic right either to be heard in the Penn Central reorganization or to appeal the entry of Order No. 63.[19]
 
 
 9
 This result will effectuate the purposes of Section 77 of the Bankruptcy Act. If those with purely derivative interests in a railroad reorganization were allowed not only to participate in these proceedings but also to appeal from the resulting decisions, the already complicated and elaborate reorganization process developed by Congress might become hopelessly confounded. Further, there is no reason to believe that the New Haven Trustee will not adequately protect the interests of creditors of the New Haven, including the members of the New Haven Committee, in the Penn Central reorganization proceedings. Finally, we have held only that the New Haven Committee has no right to appeal from a decision reached in the Penn Central Reorganization Court. This is not to say, however, that the New Haven Committee was prevented from contesting the terms of the arrangement embodied in Order No. 63 in another, more appropriate forum.[20]
 
 
 10
 For the foregoing reasons, we grant the Penn Central Trustees' motion to dismiss the appeal.
 
 
 
 [1]
 Substantially all of the assets and operations of the New Haven were sold to the Penn Central on December 31, 1968. This sale had been required by the Interstate Commerce Commission as a condition of its approval of the merger between the Pennsylvania Railroad and the New York Central Railroad into the Penn Central. See New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970)
 
 
 [2]
 Under the terms of the Memorandum, Penn Central was to receive $7.2 million cash from the MTA and a cash annual rental from the CTA equal to 5% of the aggregate salvage value of the leased lines. (The CTA also was given an option to purchase the leased lines during the term of the lease at a price equal to their salvage value when the option is exercised.) The Memorandum also provided that Penn Central would retain free trackage rights over the transferred lines for 60 years and would receive a minimum cash toll of $2.9 million per year for the use by the MTA and the CTA of the Penn Central track between Woodlawn Junction and Grand Central Station (track not formerly owned by the New Haven). Provision was also made for a service contract under which Penn Central would continue to operate the transferred lines in exchange for an annual management fee of $100,000. plus reimbursement by the MTA and the CTA for any deficits Penn Central incurred in these operations
 
 
 [3]
 When the Penn Central purchased the assets and operations of the New Haven on December 31, 1968, a part of the consideration paid to the New Haven Trustee was an issue of Penn Central 5% Divisional First Mortgage Bonds, which were secured by a Divisional First Mortgage on all the New Haven assets which had been transferred to Penn Central. The New Haven Trustee is the only holder of these Penn Central 5% Bonds
 
 
 [4]
 The claim by the New Haven Committee is apparently based upon the following language in the Penn Central Divisional First Mortgage:
 Section 10.09(a):
 "[A]ll cash and securities receivable from any and all sales or condemnations of Mortgaged Properties, plus any cash required to be paid by the Company to the Corporate Trustee pursuant to Sec. 10.08, shall be deposited with the Corporate Trustee and held by it as Deposited Cash and Securities."
 Section 10.08(4):
 "[There shall also be deposited] [s]uch cash, if any, to be held by the Corporate Trustee as Deposited Cash and Securities as shall be equal to the excess of the fair value of the portion of the Mortgaged properties being released pursuant to section 10.01 over the fair value of the proceeds to be received, as shown by the officers' Certificate."
 In view of our disposition of this appeal, we need not decide whether there is merit in the New Haven Committee's position (which apparently was first advanced and then compromised by the New Haven Trustee).
 
 
 [5]
 Presumably also reserved for future resolution was the issue raised by the New Haven Committee as to whether the 60-year lease to the CTA constitutes a sale within the meaning of the Penn Central Divisional First Mortgage. See footnote 4, supra
 Pending these determinations, the Penn Central Trustees were directed to deposit all cash consideration received with respect to property released from the Divisional First Mortgage lien with the Mortgage Indenture Trustee (p 3(a)) and to deposit other cash received pursuant to the Memorandum in a special bank account (p 3(b)). But see footnotes 6 & 20, infra.
 
 
 [6]
 Paragraph 4 of Order No. 63 declares as follows:
 "4. The obligations, if any, to be discharged by the Debtor's Trustees hereunder with respect to the claims of persons other than MTA and CTA are hereby limited to an amount which shall not exceed the sum of cash received from the sale of any property subject to the lien of the Divisional Mortgage leased to CTA pursuant to said lease plus annual rental payments as and when received by the Debtor's Trustees under said lease."
 Because of our disposition of this appeal, we need not decide whether the limitation contained in this paragraph is appropriate. We note that the Penn Central Reorganization Court has an obligation to protect the interests of the creditors and the public interest. See Penn Central Merger Cases, 389 U.S. 486, 507-511, 88 S.Ct. 602, 19 L.Ed.2d 723 (1968); New Haven Inclusion Cases, 399 U.S. 392, 489-495, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). Section 77(o) of the Bankruptcy Act, 11 U.S.C. Sec. 205(o) declares that when the reorganization court orders the sale of property free from liens, the "proceeds derived from any such sales shall be received by the trustee . . . subject . . . to any liens thereon at the time of sale . . . ." Paragraph 2 of Order No. 63 appears consistent with the above-quoted language and paragraph 4 must be read in light of the other paragraphs of the order.
 Order No. 147 of the Penn Central Reorganization Court dated January 26, 1971 (the substance of which was approved by the New Haven Reorganization Court on January 27, 1971, after a hearing on January 22, 1971), authorized the division between the Penn Central Trustees and the New Haven Trustee of approximately $18 million held by the Indenture Trustees of the Penn Central Divisional First Mortgage, which money included deposits made pursuant to p 3(a) of Order No. 63. The Penn Central Trustees contended that this division and distribution of funds permitted the continued operation of the Penn Central Railroad at a time when such operation was in extremis (N.T. 1133). See In Matter of Penn Central Transportation Co., Debtor, First Wisconsin National Bank, Appellant 453 F.2d 520 (3rd Cir., 1971), where Judge Hastie pointed out:
 "Even secured creditors of a railroad must submit to the risk inherent in judicial suspension of the rights they normally would have to enforce their liens against property of the debtor during the pendency of a reorganization proceeding. New Haven Inclusion Cases, 1970, 399 U.S. 392, 489-494, 90 S.Ct. 2054, 26 L.Ed.2d 691."
 See also Central RR. Co. v. Manufacturers Hanover Trust Co., 421 F.2d 604 (3rd Cir. 1970). Further, the division of the $18 million between the New Haven Trustee and the Penn Central Trustees was in the nature of a settlement agreement (N.T. 1127-29, 1135 ff.) and such agreements, insofar as those participating in them are concerned, are favored by the law. See Kelly v. Greer, 365 F.2d 669, 671 (3rd Cir. 1966); Main Line Theaters, Inc. v. Paramount Film Distributing Corp., 298 F.2d 801 (3rd Cir.), cert. denied, 370 U.S. 939, 82 S.Ct. 1585, 8 L.Ed.2d 807 (1962).
 
 
 [7]
 On October 27, 1970, the Penn Central Reorganization Court entered Order No. 72, which amended Order No. 63 to make it clear (1) that the New Haven Committee had not consented to Order No. 63, but (2) that no other party would be deemed to have agreed that the New Haven Committee had standing to object
 
 
 [8]
 The New Haven Committee filed its Notice of Appeal on October 23, 1970, but did not seek either a stay of execution from the Penn Central Reorganization Court or a supersedeas from this court. Accordingly, on January 4, 1971, the transfers contemplated by the Memorandum were concluded
 
 
 [9]
 On March 3, 1971, the Penn Central Trustees filed a motion in this court to dismiss the appeal of the New Haven Committee on the ground, inter alia, that it lacked standing to appeal. On May 4, 1971, after the filing of briefs and oral argument, this motion was continued for disposition by the panel hearing the merits of the appeal
 
 
 [10]
 The fact that the New Haven Committee was allowed to participate in the Penn Central Reorganization Court proceedings does not give rise to an automatic right of appeal. See Peckham v. Casalduc, 261 F.2d 120, 121 (1st Cir. 1958), cert. denied, 359 U.S. 958, 79 S.Ct. 798, 3 L.Ed.2d 766 (1959) (Chapter X Reorganization)
 
 
 [11]
 Section 77(c) (13) also provides that "upon petition therefor and cause shown . . . any other interested party may be permitted to intervene." The New Haven Committee, however, did not petition to intervene, so that it cannot claim a right to appeal as an intervenor. On the other hand, the failure to formally intervene will not preclude an appeal if the appellant in fact had a right to be heard in the reorganization proceedings. See Horowitz v. Kaplan, 193 F.2d 64, 66 (1st Cir. 1951)
 
 
 [12]
 The New Haven Committee has argued that the broad language respecting standing in several recent decisions of the Supreme Court, particularly Association of Data Processing Service v. Camp, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970), and Flast v. Cohen, 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), supports its right to appeal the entry of Order No. 63. This language, however, was manifestly not intended to apply to a railroad reorganization proceeding, where Congress has enacted a specific statutory scheme which outlines the parties entitled to participate and provides a means by which an "interested party" may be permitted to intervene (see footnote 11, supra.) See Association of Data Processing Service v. Camp, 397 U.S. 150, 154, 157, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)
 
 
 [13]
 See footnote 1, supra
 
 
 [14]
 After extensive negotiations and proceedings, the New Haven Reorganization Court on December 24, 1968, approved the release of the New Haven assets to the Penn Central pursuant to a plan of sale under which the transfers were to be substantially free and clear of all liens and encumbrances; these liens and encumbrances shifted to the proceeds of the sale and thereby remained an obligation of the New Haven estate. See New Haven Inclusion Cases, 399 U.S. 392, 410 n. 45, 416, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). This transfer of the liens and encumbrances from the assets themselves to the proceeds of sale is authorized by the following language of Section 77(o) of the Bankruptcy Act, 11 U.S.C. Sec. 205(o):
 "The judge may order and decree any sale of property . . . subject to or free from liens. The proceeds derived from any such sales shall be received by the trustee . . . subject, in case the property was sold free from lien, to any liens thereon at the time of sale, and shall be applied or disposed of in such manner as the judge by further order shall direct."
 
 
 [15]
 The total price to be paid by Penn Central for the New Haven assets and operations has not yet been finally determined and is the subject of litigation which has already reached the Supreme Court. See New Haven Inclusion Cases, 399 U.S. 392, 90 S.Ct. 2054, 26 L.Ed.2d 691 (1970). Of course, the Committee has a very substantial interest in the determination of this purchase price and, in fact, has actively participated in the New Haven Reorganization Court litigation. See 399 U.S. at 489-495, 90 S.Ct. 2054, 26 L.Ed.2d 691
 
 
 [16]
 Standing to appeal an order of a railroad reorganization court requires a direct personal interest in the subject matter of the order and a showing that the appellant is aggrieved or prejudiced by the order. See, e. g., Comstock v. Thompson, 158 F.2d 151 (8th Cir. 1946); In Re Huntingdon & Broad Top Mt. RR. & Coal Co., 213 F.2d 411 (3rd Cir. 1954)
 
 
 [17]
 See pp. 7-8 and footnote 14, supra
 The New Haven Committee argues that it is not entirely clear that the New Haven property has finally passed to the Penn Central in view of the Supreme Court's decision that the Penn Central must pay more for this property than the amounts originally determined by either the I.C.C. or the New Haven Reorganization Court. The New Haven Committee argues that the New Haven Trustee now holds an "equitable lien" on the former New Haven property because the I.C.C. and the New Haven Reorganization Court may yet decide that the entire transaction (that is, the sale of the New Haven to Penn Central) should be undone and the property returned to the New Haven. But even if the New Haven Trustee has such an "equitable lien" on this property (see holding of New Haven Reorganization Court quoted at footnote 2 of In Matter of Penn Central Transportation Company, Debtor, Smith, Trustee, appellant, 454 F.2d 210 (3rd Cir.)), it does not follow that the New Haven bondholders have a claim to the property within the meaning of Section 77(b) of the Act. As in the case of the claim to the proceeds of the sale of the New Haven assets to Penn Central (discussed below), the claim of the New Haven Committee is essentially derivative from the claim of the New Haven Trustee and thus does not fall within the terms of Section 77(b).
 
 
 [18]
 See footnote 3, supra
 
 
 [19]
 The New Haven Committee has suggested that its members should be considered "stockholders" of the Penn Central because of the possibility that they will own all the stock of the New Haven. Even if this were to occur, however, it would not aid the Committee, since it is clear that the stockholders of a creditor are not themselves "creditors" within the meaning of Section 77(b). See Callaway v. Benton, 336 U.S. 132, 139, 69 S.Ct. 435, 93 L.Ed. 553 (1949)
 
 
 [20]
 For example, the New Haven Committee is a party to the New Haven reorganization proceedings and it might have initiated an action in that court to challenge the New Haven Trustee's agreement to the entry of Order No. 63 if it felt that that this agreement violated the terms of the Penn Central Divisional First Mortgage. See footnotes 3 & 4, supra. Indeed, the appropriateness of this agreement was at least indirectly before the New Haven Reorganization Court at a hearing on January 22, 1971 sur Petition of Trustee For Approval of Agreement with Penn Central Trustees dated 1/20/71, reciting in paragraph 4 the agreement to divide the funds as stated in note 6 above, after which that court entered its Order No. 631 on 1/27/71 approving this agreement. The effect of Orders 631 and 147 (in which the Penn Central Reorganization Court approved this agreement on 1/26/71) was to modify p 3(a) of Order No. 63 to allow a distribution of the money held by the Mortgage Indenture Trustees (see footnotes 5 & 6, supra). The New Haven Committee, though a party to the New Haven reorganization proceedings, did not object to the court's aproval of the agreement (see N.T. of 1/22/71 hearing)