596 F.2d 1155
 In the Matter of PENN CENTRAL TRANSPORTATION COMPANY, Debtor.
Appeal of Joseph A. SCHAFER, Whitney W. Irons, Alton P.
Gainer, Emil Milan, Carol Kuchar, Leo Sukala,
Stephen Sloboda, Charles W. Hannon, and
Philip Morton, in Nos.
78-1715, 78-2321 and
78-2336.
In the Matter of PENN CENTRAL COMPANY, Debtor.
 Nos. 78-1715, 78-2321 and 78-2336.
 United States Court of Appeals,
Third Circuit.
 Argued Oct. 16 and 17, 1978.
Decided Jan. 11, 1979.
As Amended Feb. 8 and March 1, 1979.
 
 Cletus P. Lyman, Lyman & Ash, Philadelphia, Pa., for appellants Joseph A. Schafer, et al.
 Covington & Burling, Philip R. Stansbury, Wesley S. Williams, Jr., Wynne M. Teel, Washington, D. C., Carl Helmetag, Jr., Philadelphia, Pa., Charles A. Horsky, W. Crosby Roper, Jr., Brice M. Clagett, Washington, D. C., James E. Howard, John J. Ehlinger, Jr., Philadelphia, Pa., for the Trustees of Penn Central Transp. Co. in Nos. 78-1715 & 78-2321.
 Gilbert W. Oswald, James D. Crawford, Schnader, Harrison, Segal & Lewis, Philadelphia, Pa., for appellees Penn Central Co. and Penn Central International N.V.
 Before ALDISERT, GIBBONS and HIGGINBOTHAM, Circuit Judges.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 There are 150,000 shareholders in the Penn Central Company of which only nine have appealed from certain orders concerning two bankruptcy proceedings: the reorganization of the Penn Central Transportation Company pursuant to section 77 of the Bankruptcy Act, 11 U.S.C. § 205, and the arrangement of the Penn Central Company pursuant to Chapter XI, 11 U.S.C. § 701 Et seq. For the reasons given below we will dismiss certain appeals because of the appellants' lack of standing and will affirm those orders from which valid appeals were taken. Other challenges to the Penn Central Transportation Company's Plan of Reorganization are dealt with in Judge Aldisert's opinion in In re Penn Central Transportation Co., 596 F.2d 1154 (3d Cir. 1979) and in Judge Gibbons' opinion in In re Penn Central Transportation Co., 596 F.2d 1102 (3d Cir. 1979).
 
 
 2
 Until 1969, the Penn Central Railroad was operated by a company named the Penn Central Company. In that year the stockholders approved a reorganization of the Penn Central Company through which the common stock of the Penn Central Company was exchanged, on a one-for-one basis, for the common stock of a holding company. The old Penn Central Company, now a wholly owned subsidiary of the holding company, changed its name to the Penn Central Transportation Company and the holding company took the name Penn Central Company. The reorganization was accomplished to facilitate consolidation of the railroad business as well as diversification into non-railroad enterprises.
 
 
 3
 The Penn Central Company (PCC) and a wholly owned subsidiary, Penn Central International N.V., are debtors-in-possession in a proceeding pursuant to Chapter XI of the Bankruptcy Act. That proceeding is under the supervision of Chief Judge Joseph S. Lord, III of the United States District Court for the Eastern District of Pennsylvania. The Penn Central Transportation Company (PCTC) is undergoing reorganization pursuant to section 77 of the Bankruptcy Act, 11 U.S.C. § 205. The crucial interdependence of the PCC's Chapter XI arrangement proceedings and the PCTC's section 77 reorganization proceedings will become apparent in the course of this opinion.
 
 
 4
 Order No. 1 of the PCTC reorganization under section 77 was filed on June 21, 1970. The Trustees of the PCTC first submitted their plan of reorganization in July of 1973. On March 9, 1978, after extensive hearings and numerous compromises, the reorganization court approved the amended plan of reorganization proposed by the PCTC's Trustees. See In re Penn Central Transportation Co., 458 F.Supp. 1234 (E.D.Pa.1978) (hereinafter referred to as Approval Opinion). On August 17, 1978, following approval of the plan by creditors and stockholders pursuant to section 77(e), the reorganization court entered an order confirming the plan and also ordered that the plan be consummated on October 24, 1978. See In re Penn Central Transportation Co., 458 F.Supp. 1364 (E.D.Pa.1978) (hereinafter referred to as Confirmation and Consummation Opinion).
 
 
 5
 On July 22, 1976, PCC filed its petition for arrangement under Chapter XI. Its petition to remain in possession and continue operations was granted on August 16, 1976. On August 10, 1976, it received the permission to employ counsel. On March 16, 1978, the PCC filed its plan of arrangement in the Chapter XI proceedings. On April 21, 1978, the Chapter XI Court granted PCC permission to vote in favor of the PCTC Plan of Reorganization that the reorganization court had approved. On July 27, 1978, the appellants filed a complaint before the Chapter XI Court seeking to set aside PCC's vote in favor of the plan and to enjoin the PCC from taking any steps to consummate either the PCTC plan of reorganization or the PCC plan of arrangement without the consent of PCC's shareholders. Appellants also sought an order requiring the holding of a meeting of PCC shareholders. The Chapter XI Court granted summary judgment against the appellants on August 16, 1978. On August 21, 1978, the Chapter XI Court confirmed PCC's plan of arrangement. Appellants appealed the orders confirming the PCC arrangement and granting summary judgment against them to the district court supervising the Chapter XI proceedings. The district court affirmed the granting of summary judgment on October 10, 1978 and the confirming of the plan of arrangement on October 12, 1978.
 
 
 6
 Appellants are nine shareholders of the Penn Central Company. They are appealing from the orders of the Chapter XI Court approving the plan of arrangement and granting summary judgment against them on their complaint filed in that court. They are also appealing from the reorganization court's orders that approved the plan of reorganization, confirmed the plan and ordered consummation of the plan. A motion to stay consummation of the PCTC plan was denied by this court on October 17, 1978. We will discuss first the appeals from the reorganization court's orders and then the appeals from the orders of the Chapter XI Court.
 
 
 7
 APPEALS FROM THE ORDERS OF THE REORGANIZATION COURT
 
 
 8
 The Trustees of the PCTC have moved to dismiss the appeals from the reorganization court's orders by the nine PCC shareholders here on the ground that they lack standing in that they are not shareholders or creditors of the PCTC. We agree with the Trustees that appellants have no standing to press these appeals.
 
 
 9
 As this court has stated in an earlier appeal in this reorganization proceeding, "the standing of a participant to a railroad reorganization to appeal from an order of the reorganization court turns on whether Section 77(c) (13) of the Bankruptcy Act, 11 U.S.C. § 205(c)(13) (1964), grants him a right to be heard." In re Penn Central Transportation Co., 455 F.2d 811, 815 (3d Cir.), Cert. denied, 407 U.S. 915, 92 S.Ct. 2440, 32 L.Ed.2d 690 (1972) (footnote omitted).
 
 
 10
 Section 77(c)(13) provides in relevant part:
 
 
 11
 The debtor, any creditor or stockholder, or the duly authorized committee, attorney or agent of either or the trustee or trustees of any mortgage, deed of trust or indenture pursuant to which securities of the debtor are outstanding, shall have the right to be heard on all questions arising in the proceedings, and, upon petition therefor and cause shown, any such person or any other interested party may be permitted to intervene. The judge may, after hearing, make reasonable rules defining the matters upon which notice shall be given to other than interveners and the manner of giving such notice.[1]
 
 
 12
 Appellants have not sought to intervene below. The reorganization court has previously denied intervention to other PCC shareholders and we have upheld that denial. See In re Penn Central Transportation Co., 328 F.Supp. 1273 (E.D.Pa.1971), Aff'd per curiam, 455 F.2d 976 (3d Cir.), Cert. denied, 407 U.S. 915, 92 S.Ct. 2440, 32 L.Ed.2d 690 (1972). Failure to seek intervenor status would not, however, be fatal to this appeal if appellants had a right to be heard in the proceedings below. In re Penn Central Transportation Co., 455 F.2d 811, 815 n. 11 (3d Cir.), Cert. denied, 407 U.S. 915, 92 S.Ct. 2440, 32 L.Ed.2d 690 (1972). Appellants, however, did not have the right to be heard below.
 
 
 13
 Appellants are stockholders of the PCC, not the debtor PCTC.[2] This court faced a similar issue when bondholders of a creditor of the PCTC sought to appeal a reorganization court order authorizing the sale and lease of certain of the PCTC's property. The court held that the bondholders lacked standing to appeal stating, "The relevant language of the Bankruptcy Act indicates . . . that Congress did not intend that those with simply a derivative interest in a railroad reorganization proceeding have a right to be heard and to appeal. See Callaway v. Benton, 336 U.S. 132, 139, 69 S.Ct. 435, 93 L.Ed. 553 (1949); Boston & Providence Railroad Stockholders Development Group v. Smith, 333 F.2d 651 (2d Cir. 1964)." In re Penn Central Transportation Company, 455 F.2d 811, 816 (3d Cir.), Cert. denied, 407 U.S. 915, 92 S.Ct. 2440, 32 L.Ed.2d 690 (1972). Appellants, as shareholders of a shareholder of PCTC, are in no better position than the appellants in the above case who were creditors of a creditor of PCTC. Appellants raise, however, several arguments in an attempt to avoid the force of this logic and authority.
 
 
 14
 Appellants argue that the bondholders in the prior appeal were held not to have standing partially because their interests were adequately represented by the Trustee for the company whose bonds they held. Appellants assert that there is no adequate representative of their interest since the directors of PCC have already consented to the plan without consulting with the shareholders and without holding a shareholder meeting since 1974. We will discuss the matter of shareholder participation more fully with respect to the appeals from the Chapter XI Court. We need only state here that we see no basis on which to conclude that PCC's directors have not adequately represented the interests of PCC shareholders. Certainly, the fact that PCC has voted in favor of the reorganization plan is no evidence of inadequate representation.
 
 
 15
 The appellants also argue that the bankruptcy and impending dissolution of PCC operates to make their claims less derivative and more direct. The impending dissolution of the PCC does not convert appellants' interest in the PCC into a direct interest in the PCTC. Indeed, appellants will never have a direct interest in the PCTC since as a result of the PCC arrangement and the PCTC reorganization, appellants will receive shares in the reorganized corporation. We do not, however, place blind reliance on these formalities. There may well be situations where technically derivative interests are so direct and where other parties are such inadequate representatives of these interests that the holders of such interests would be entitled to direct participation in reorganization proceedings, even if they had failed to previously seek intervention. We hold only that the appellants' interests here are not sufficiently direct and unrepresented that they can be considered shareholders of the PCTC within the meaning of § 77(c)(13).
 
 
 16
 Appellants next contend that even if they are not entitled to be heard pursuant to § 77(c)(13), § 77(e) of the Bankruptcy Act, 11 U.S.C. § 205(e), independently provides them with standing. More specifically, they rely on the first sentence of that subsection which provides:
 
 
 17
 Upon the certification of a plan by the Commission to the court, the court shall give due notice to all parties in interest of the time within which such parties may file with the court their objections to such plan, and such parties shall file, within such time as may be fixed in said notice, detailed and specific objections in writing to the plan and their claims for equitable treatment.
 
 
 18
 Appellants argue that the reference to "all parties in interest" was intended to allow participation for a broader range of interests than that allowed by § 77(c)(13). The rationale for such a distinction, appellants assert, is that, although it would be impractical to allow all interested parties to participate in the proceedings that lead up to the proposal of a plan, it is more practical to allow all such parties to be heard, essentially on a one time basis, with respect to the fairness of the plan itself. Also, participation by all interested parties is most essential at this climactic stage of the reorganization proceedings. We believe, however, it is clear from the statute that no such two-tiered standing test was intended by Congress. Section 77(c)(13), by its terms, seems to define standing with respect to all proceedings. It is unreasonable to construe the bare reference to "all interested parties" in § 77(e) as establishing a different standard with respect to hearings on the plan itself without any other indication of an intention to establish an exception to § 77(c)(13). Moreover, the second sentence of § 77(e) indicates that no such exception was intended. That sentence reads:
 
 
 19
 The judge shall, after notice in such manner as he may determine to the debtor, its trustee or trustees, stockholders, creditors, and the Commission, hear all parties in interest in support of, and in opposition to, such objections to the plan and such claims for equitable treatment.
 
 
 20
 Thus it appears that the reference to "all interested parties" is to those parties given a right to be heard under § 77(c)(13), namely stockholders, creditors and other interested parties allowed to intervene by the reorganization court in the exercise of its discretion. We conclude, therefore, that appellants cannot be heard under § 77(e) if they do not meet the requirements of § 77(c)(13). And they do not.
 
 
 21
 Appellants argue finally that the Trustees are estopped from contesting their standing because at least one of the appellants was included on the service list pursuant to the reorganization court's order number 3013 and has received copies of many of the papers filed by the parties in the court of the reorganization proceeding. Appellants also note that their arguments have been referred to by the reorganization court in its opinions. These facts are insufficient to establish an estoppel against the Trustees. As this court stated in reply to the arguments of the bondholders' committee which also sought standing on the basis of an estoppel argument, "The fact that the New Haven Committee was allowed to participate in the Penn Central Reorganization Court proceedings does not give rise to an automatic right of appeal. See Peckham v. Casalduc, 261 F.2d 120, 121 (1st Cir. 1958), Cert. denied, 359 U.S. 958, 79 S.Ct. 798, 3 L.Ed.2d 766 (1959) (Chapter X Reorganization)." In re Penn Central Transportation Co., 455 F.2d 811, 815 n. 10 (3d Cir.), Cert. denied, 407 U.S. 915, 92 S.Ct. 2440, 32 L.Ed.2d 690 (1972).
 
 
 22
 Having exhausted appellants' list of arguments in opposition to the motion to dismiss, we are left with the conclusion that appellants do not have standing to appeal orders of the reorganization court and, therefore, that the motion to dismiss must be granted. Because of the importance of this matter and the potentially devastating consequences of unnecessary delay, however, we deem it advisable to discuss the merits of appellants' claims so as to reduce the likelihood of a remand to this court should the Supreme Court decide that we have erred in dismissing these appeals. The merits of these appeals have been briefed and there was oral argument on these issues.
 
 
 23
 Because the overall plan of reorganization has been discussed and summarized quite fully in the opinions issued today by Judges Aldisert and Gibbons as well as in Judge Fullam's opinion approving the plan, we will not describe in detail the workings of the plan. We will sketch here only the barest outlines of the plan. Claims of the U.S. government, state and local tax claims, and other administration and priority claims are paid either fully in cash or by varying combinations of cash and notes. Secured creditors receive a mix of cash, bonds, preference stock and common stock in the reorganized company. Unsecured creditors receive common stock and certificates of beneficial interest. In combination, secured and unsecured creditors receive 90% Of the common stock in the reorganized company. The remaining 10% Of the stock goes to the PCC, PCTC's sole shareholder. Appellants argue that this does not constitute fair and equitable consideration for the interest in PCTC which PCC is giving up. Appellants also argue that it is improper to implement any plan at this time.
 
 
 24
 For convenience of exposition, we will discuss the second argument first. The main factor which distinguishes this reorganization from all reorganizations that have preceded it is not its mere size or complexity though we are aware of no larger or more complex reorganization proceeding in our history. The main distinguishing factor is rather that Congress has mandated, by statute, the conveyance of all of PCTC's prime railroad operating assets to Conrail and has established a Special Court to determine the proper compensation for these conveyed assets. No such determination is expected before 1987. The Special Court proceeding is referred to as the Valuation Case. Appellants ask us to require the reorganization court to await the outcome of the Valuation Case before approving Any plan. Such a result, far from being necessary, would be unconscionable. The following excerpt from Judge Fullam's opinion explains why this is so:
 
 
 25
 Perhaps the most striking feature of the Plan proceedings has been that, notwithstanding the welter of objections, counterproposals, charges and countercharges, it appears that no one has consciously advocated abandoning the attempt to achieve a Plan of Reorganization at this time. And there is almost equally unanimous agreement on the proposition that retention of Pennco as the operating core of the reorganized company is essential. As an assessment of the economic realities of the situation, this business judgment is undoubtedly sound, as noted in the SEC Report. In view of the ramifications, intended or unintended, of some of the arguments presented, however, the Court must initially consider whether present approval of a Plan of Reorganization, with its attendant compromises, unfairly prejudices senior creditors whose claims might otherwise be more promptly satisfied. Arguably, if that were the case, the Plan should not be approved, no matter how globally beneficial it might be.
 
 
 26
 At first blush, it would seem theoretically possible to simply liquidate all retained assets immediately, pay the proceeds to top-ranking claimants in descending order of priority, await the outcome of the Valuation Case, and then complete the liquidation process by distributing the proceeds as far down the priority ladder as they would reach. While this course of action would undoubtedly produce less total benefit for the creditors than would a Reorganization Plan, it would theoretically produce more immediate payment to the senior creditors whose claims are entitled to priority treatment.
 
 
 27
 Upon analysis, however, it becomes immediately apparent that in the absence of compromise, even that simplistic and draconian result could not be achieved any more speedily than a Plan of Reorganization which provides greater benefits for all. The reason lies in the nature and complexity of the legal issues which, in the absence of compromise, would have to be litigated.
 
 
 28
 In their evidentiary submission, the Trustees have spelled out in some detail the major sources of potential litigation. These include the disputes concerning the relative priority of governmental claims, state, local and federal; the validity of the Pennco pledge agreement; a host of issues concerning the coverages of various mortgages and the correct application of marshalling principles; and what is perhaps the most significant but least understood problem, unraveling the intricate relationships between the Debtor and the Secondary Debtors. And even if these disputes could be finally resolved through litigation by the early 1980s, as the Trustees assume, there is another aspect of the matter which the Trustees appear to have somewhat underestimated. All of these disputes are interrelated. Generally speaking, the highest-priority claims must be finally resolved before distribution to lower classes could begin. For that reason, until the highest-priority claims are known, it is virtually impossible to determine correctly the treatment which lower classes of claims should receive. It is unlikely, therefore, that litigation of all of these major disputes could efficiently be pursued simultaneously. Stated otherwise, if the litigation proceeded simultaneously, it might well be necessary, upon completion of one round of litigation, to commence an entirely new round of litigation in order to determine how the results of the first round of litigation should be implemented (either in a Plan of Reorganization, or in the hypothetical liquidation distributions).
 
 
 29
 Until the validity and priority of the Government claims were finally determined through litigation, no distributions of any kind could be made. Until the issues surrounding the state and local tax claims were determined through litigation (Section II-F), distributions to bondholders would seem unlikely. Perhaps more importantly, until the amount of the recovery in the Valuation Case became known, it would be impossible intelligently to work through the problem of allocating unpaid administration claims among the various mortgages, rendering distribution impossible. And until the Secondary Debtor issues were resolved, those assets would not be available for Penn Central creditors.
 
 
 30
 Thus, achieving a Plan at this time would expedite, rather than delay, distributions to senior claimants as well as junior claimants, and there is no valid reason for rejecting the obvious overall economic advantages reorganization would entail.
 
 
 31
 The final, and equally obvious, point to be made is that there simply can be no reasonably prompt Reorganization Plan which does not embody compromise solutions of these litigable issues. The true choice, then, is among prompt achievement of a beneficial Plan which provides some immediate distributions to creditors and greater distributions in the long run, or holding matters in abeyance until all litigation, including the Valuation Case litigation, is concluded, and then attempting to achieve a Plan, or pursuing the economically wasteful course of a liquidation in which distributions to creditors would be withheld for many years. The choice is obvious.
 
 
 32
 Approval Opinion, 458 F.Supp. at 1263. We are fully persuaded and convinced by these arguments and have no doubt that to wait close to ten years before formulating a reorganization plan would be to pursue a ruinous course. We wish to add two rather obvious comments with respect to the desirability, from the viewpoint of PCC's shareholders, of awaiting the Valuation Case recovery. First, delaying the plan can only add to the administration expenses that would have to be satisfied before equity interests can participate. Secondly, as will be discussed below, there is a substantial possibility that PCC shareholders would receive nothing at all if no plan were adopted before the Valuation Case was decided. There is some possibility that the PCC, like any other party to the plan, may do worse under the plan than it would have done if no plan were consummated before the Valuation Case was decided. There is also a substantial possibility that it will do better. We are satisfied, however, that it is in the interest of all that the plan be consummated now.
 
 
 33
 The question remains whether the plan here is "fair and equitable" to the PCC[3] within the meaning of section 77(e). See e. g., Group of Institutional Investors v. Chicago, Milwaukee, St. Paul & Pacific R.R., 318 U.S. 523, 63 S.Ct. 727, 87 L.Ed. 959 (1943). To be "fair and equitable" all parties must receive the "equitable equivalent" of their claims. In determining equitable equivalence, it is not necessary to assign specific dollar values to every claim given up and every new security received in exchange. See Reconstruction Finance Corp. v. Denver & Rio Grande Western R.R., 328 U.S. 495, 517, 66 S.Ct. 1282, 90 L.Ed. 1400 (1946); Group of Institutional Investors, supra, 318 U.S. at 565-566, 63 S.Ct. 727; Ecker v. Western Pacific R.R., 318 U.S. 448, 487, 63 S.Ct. 692, 87 L.Ed. 892 (1943). Whether a reorganization plan should be approved is a question committed largely to the discretion of the district court and appellate review of the exercise of this discretion is of limited scope. See Group of Institutional Investors v. Chicago, Milwaukee, St. Paul and Pacific R.R., supra, 318 U.S. at 563-64, 63 S.Ct. 727; Ecker v. Western Pacific R.R., supra, 318 U.S. at 487, 63 S.Ct. 692. Of course, our review of whether the relevant legal principles were properly applied is plenary. If applicable legal principles are properly applied, we will not reverse a lower court's approval unless we conclude that the district court's discretion has been abused.
 
 
 34
 As mentioned, the PCC receives ten percent of the shares of the reorganized company. PCC is entitled to participate at all only as a result of the finding of solvency by the district court which we affirm. See Group of Institutional Investors, supra, 318 U.S. at 541-542, 63 S.Ct. 727; Case v. Los Angeles Lumber Products Co., 308 U.S. 106, 115-116, 60 S.Ct. 1, 84 L.Ed. 110 (1939). The district court stated in this regard, "(I)f the Valuation Case should produce a very small recovery, the assumption of solvency would be incorrect . . . Since the record does not permit a finding of insolvency, and indeed it seems more probable than not that the estate is solvent, I am satisfied that the Trustees' assumptions represent the proper course of action." Approval Opinion, 458 F.Supp. at 1255.
 
 
 35
 Thus it is apparent that there is considerable uncertainty as to whether the PCC is entitled to receive any compensation at all. The extent of this uncertainty is illustrated by the following facts. The reorganization court found that a Valuation Case recovery with a present value of approximately $887 million would be necessary to retire all securities senior to the common stock. Confirmation and Consummation Opinion, 458 F.Supp. at 1372. Both secured and unsecured creditors receive common stock as part of their compensation. The reorganization court recognized that the retirement of all securities senior to the common stock would not result in full compensation to the secured creditors. The common stock's value must be enhanced by the Valuation Case recovery in order to result in full compensation. Although the exact amount of the Valuation Case recovery necessary to accomplish this enhancement cannot be computed with any precision, it is clear that unless the Valuation Case yields a recovery substantially in excess of 900 million dollars, the unsecured creditors, much less the shareholders of PCTC would have no right to participate.[4]
 
 
 36
 What, then, is the likely recovery from the Valuation Case? Appellants have referred to a letter from a member of the Securities and Exchange Commission staff to one of the appellants mentioning that the Valuation Case could yield between 500 million and 11 billion dollars. Letter of February 1, 1978 from Wilnetta S. Marks to Charles W. Hannon, reproduced in Appellants' Brief, on Appeal No. 78-1715, at Appendix A, p. 4. The Special Court has characterized as "incredible" the United States Railway Association's initial offer of 506.5 million dollars. In re Valuation Proceedings, 445 F.Supp. 994, 1029 (Special Court 1977). Thus a recovery below that figure seems unlikely. It is also improbable, however, that the Valuation Case recovery will approach 11 billion dollars. The Special Court has already held that it would not accept the theories upon which such a recovery would have to be premised. That court stated, "(W)e do not intend to consider estimates of reproduction cost, variations on that theme such as 'assemblage value,' value of materials 'in place,' trended original costs, gross liquidation value or societal values." In re Valuation Proceedings, 445 F.Supp. 994, 1031 (Special Court 1977).
 
 
 37
 On the basis of these figures and upon a full consideration of the other relevant facts and issues, Judge Fullam found that "no greater participation (by PCC) than the Plan provides can be justified on the present record." Approval Opinion, 458 F.Supp. at 1343. The PCC itself supports and voted for the plan. The SEC, after a thorough analysis, also concluded that the plan was fair and equitable and met the requirements of section 77. Staff Report of the Securities and Exchange Commission on Plans of Reorganization, Appendix, Vol. 1, Book 3, p. 1236.
 
 
 38
 The entire record of the reorganization proceedings demonstrates clearly that the reorganization court did a truly extraordinary job of performing its exceedingly difficult, complex and time-consuming duties. To be the judge presiding over the perplexing Penn Central Transportation Company reorganization required the patience of Job, the wisdom of Solomon and the perceptive insight of Roscoe Pound. Though Judge Fullam would deprecate such personal reference as hyperbole, nevertheless after having studied thousands of pages of briefs, records and Judge Fullam's many orders and decisions, it is evident that he has presided over this perplexing case as adroitly and as effectively as any judge could. In fact, there are probably very few, if any, who could have done as well. Both the public generally and the litigants throughout this case are indebted to him for such an extraordinarily effective judicial performance. The plan of reorganization under review today, is itself a monument to the outstanding stewardship of the reorganization court in this matter. We have no doubt that the Reorganization Court exercised sound judgment in concluding that the plan provides fair treatment and compensation to the PCC.
 
 
 39
 Appellants argue, however, that the PCC should receive a contingent interest in the Valuation Case so that it would receive all the benefit of an unexpectedly large Valuation Case recovery. The PCC, instead of this purely contingent interest, has received present equity in the reorganized company that will benefit from any large recovery from the Valuation Case. Once we conclude that the plan's compensation is fair, the existence of other fair alternatives is irrelevant. Thus, although a plan which gave the PCC a possibly larger but purely contingent interest in the Valuation Case could perhaps have been approved, this does not alter our conclusion that the plan here which gives the PCC a smaller present interest is fair and should be approved. See Ecker v. Western Pacific R.R., supra 318 U.S. at 475-76, 63 S.Ct. 692.
 
 
 40
 Appellants' last argument is that the combination of the PCTC plan of reorganization and the PCC plan of arrangement results in a deprivation of property unlawful under the Fifth Amendment. If, however, both the reorganization plan and the arrangement meet the requirements of section 77 and Chapter XI respectively, no such constitutional violation would exist. The Chapter XI arrangement will be discussed in the next section of the opinion. We are satisfied, however, that the plan here fully meets all the requirements of section 77 and, in particular, the amount of common stock received by the PCC is fair and equitable. If we were called upon to decide the merits of this issue, we would so hold.
 
 THE CHAPTER XI PROCEEDINGS
 
 41
 As mentioned, the appellants are appealing from two orders issued in the Chapter XI proceedings. The first is an order granting summary judgment against appellants on a complaint filed before the bankruptcy court presiding over the Chapter XI proceedings. The second is an order confirming the PCC's plan of arrangement.
 
 
 42
 The appellants' complaint alleges that the PCTC plan of reorganization constituted an exchange of substantially all of PCC's property or a voluntary liquidation of PCC and that, therefore, shareholder approval was required under 15 P.S. Sections 1311(B) and 2102. The complaint also alleges that PCC's management has violated 15 P.S. Sections 1501(B) and 1318 requiring the holding of annual meetings of shareholders and the issuance of annual financial statements to shareholders. As relief, appellants asked the court to set aside PCC's vote in favor of the PCTC plan and set aside the court's order authorizing such vote. The appellants also asked the court to enjoin the PCC "from taking any additional step toward consummation of the PCTC plan of reorganization and defendant's (PCC's) plan of arrangement and dissolution, until the management of defendant obtains its stockholders' consent therefor," and to order the PCC to hold a meeting and send out financial statements.
 
 
 43
 Six of PCC's seven directors were elected in November, 1974 to serve "for a one year term or until their successors are fully elected and qualified." The seventh director was appointed by the other six in May, 1975. They are collectively entrusted with the management of the company. See 15 P.S. § 401. Thus, in the absence of specific statutory or other authority to the contrary, the directors would have the power to vote for approval or disapproval of a plan of reorganization of a company in which PCC holds shares. The Bankruptcy Act certainly does not require a corporate owner of shares in a company undergoing reorganization to solicit the viewpoints of its shareholders before voting on a plan of reorganization. 15 P.S. § 1501(B) does require that a shareholder meeting be held once a year. That section, however, expressly provides the following: "Failure to hold the annual meeting at the designated time shall not work any forfeiture or dissolution of the corporation." Furthermore it is provided, "If the annual meeting shall not be called and held during such calendar year, any shareholder may call such meeting at any time thereafter." Thus it is apparent that the Pennsylvania legislature did not intend that the consequence of the failure to hold a meeting would be to deprive the management of a corporation of its authority to run the corporation. By § 1501(B) appellants had the right to call a meeting themselves, but they did not do so. Likewise, there is no authority to indicate that the failure to distribute annual financial statements would deprive management of its power.[5]
 
 
 44
 Appellants' complaint also refers to 15 P.S. Sections 1311(B) and 2102 which require shareholder approval of exchanges of substantially all of a defendant's property and of voluntary liquidation respectively. Although the complaint does not clearly state appellants' theory as to the applicability of these provisions to PCC's directors' actions here, the theory seems to be that the PCTC reorganization and the PCC arrangement are each part of the process by which the exchange of all PCC's property and the dissolution of PCC itself is accomplished and that, therefore, shareholder approval is needed for each part of the process. We certainly agree that the PCTC plan is interrelated with the PCC plan and that the approval of the PCTC plan is part of the process by which PCC's liquidation is accomplished as provided for in its plan of arrangement. Unfortunately, for appellants, this very interrelationship dooms their contentions.
 
 15 P.S. Section 1320(1) provides:
 
 45
 (1) Any business corporation having a plan of reorganization or an arrangement which, pursuant to the provisions of the Act of Congress of July first, one thousand eight hundred and ninety-eight, entitled "An act to establish a uniform system of bankruptcy throughout the United States," as amended and supplemented, or of any similar Act of Congress (said act and such acts being herein referred to as the National Bankruptcy Act), has Been or shall be confirmed by the decree or order of a court of competent jurisdiction, shall have full power and authority to put into effect and carry out the plan of arrangement and the decrees and orders of the court, or judge or referee relative thereto, and may take any proceeding and do any act provided in the plan or arrangement or directed by such decrees and orders, without further action by its directors or shareholders. Such power and authority may be exercised, and such proceedings and acts may be taken, as may be directed by such decrees or orders, by the trustee or trustees, or receiver or receivers, of such corporation appointed in the bankruptcy proceedings (or a majority thereof), or if none be appointed and acting, be designated officers of the corporation, or by a master or other representative appointed by the court or judge or referee, with like effect as if exercised and taken by unanimous action of the directors and shareholders of the corporation. (emphasis supplied and footnote omitted)
 
 
 46
 The order of the court authorizing PCC's vote in favor of the PCTC plan of reorganization was clearly relative to PCC's arrangement proceeding and therefore PCC properly voted for the plan as directed by the order without seeking further action by PCC's shareholders. That section 1320 was intended to create an exception to the requirements for shareholder approval set forth in sections 1311(B) and 2102 is made even clearer by subsection (2) of 1320 which specifically states, "Such corporation may, in the manner above provided . . . dissolve (or) transfer all or part of its assets . . . ." Thus, since no statutory provision or other authority makes illegal the vote of PCC's management in favor of the PCTC plan or makes improper the order authorizing that vote, we conclude that the order granting summary judgment against appellants with respect to the complaint in question should be affirmed.
 
 
 47
 The remaining issue is whether the district court properly confirmed PCC's plan of arrangement. Arrangements under Chapter XI are designed to readjust the rights of unsecured creditors, not shareholders. See, In re Texas Consumer Finance Corp., 480 F.2d 1261 (5th Cir. 1973). Shareholder approval is not required for a Chapter XI plan of arrangement. Only unsecured creditors vote on whether to approve the plan. See Section 362 of Chapter XI of the Bankruptcy Act, 11 U.S.C. § 762. The Act provides that a plan of arrangement shall be confirmed if the court is satisfied that the plan "is for the best interests of the creditors and is feasible . . . ." 11 U.S.C. § 766. Shareholder approval is not required because an arrangement under Chapter XI may not deal with the rights of shareholders. In re Texas Consumer Finance Corp., supra, 480 F.2d at 1265. A plan of arrangement which overcompensates unsecured creditors would interfere with the rights of shareholders. We must therefore determine whether the plan does overcompensate PCC's creditors and therefore whether the rights of PCC's shareholders have been prejudiced.
 
 
 48
 The only major indebtedness of the PCC is in the form of Swiss franc notes in the current equivalent of about 150 million dollars after deduction of a portion of the debt which is secured by PCTC stock. The Union Trust Company is the Trustee for the holders of these notes. PCC will receive, pursuant to the PCTC plan, a total of approximately 2,315,375 shares of the reorganized company's common stock.[6] Under the plan of arrangement, 60% Or approximately 1.39 million shares of the common stock issued to PCC under the PCTC reorganization plan would be received by the holders of the Swiss franc notes and the remaining 40% Would be received by PCC's shareholders.
 
 
 49
 As mentioned above,[7] there was testimony at the hearings on approval of the PCTC plan valuing the common stock at approximately $6 per share. At this valuation, the Swiss franc note holders would be receiving less than 8.5 million dollars on a 150 million dollar debt. Even according to the SEC's more optimistic valuation of the reorganization company's net worth,[8] the note holders would be receiving the equivalent of only about 36 million dollars. Thus, only if the Valuation Case recovery is so huge as to increase the value of the stock many times would the note holders receive more than they are owed. By any reasonable valuation of the compensation which the noteholders are receiving under the plan of arrangement, they are not being overcompensated and therefore, PCC's shareholders are not prejudiced by the plan.[9] Since we also conclude that the plan is in conformance with all other requirements of law, we hold that the district court did not err in confirming the plan.[10]
 
 
 50
 For the foregoing reasons, the appeals from the orders of the reorganization court will be dismissed and the orders of the Chapter XI Court will be affirmed.
 
 
 
 [1]
 Bankruptcy Rule 8-210 is of similar import. That Rule provides:
 Rule 8-210. Standing to be Heard: Intervention
 (a) Standing to be Heard.
 (1) The debtor, the indenture trustees, and any creditor or stockholder of the debtor shall have the right to be heard on all matters arising in a Chapter 8 case.
 (2) A labor union or employees' association, representative of employees of the debtor, shall have the right to be heard on the economic soundness of a plan affecting the interests of the employees.
 (b) Intervention of Right for Governmental Bodies. The Department of Transportation and the Interstate Commerce Commission may, or if requested by the court shall, intervene in a Chapter 8 case. One representative of any state in which the debtor operates its rail line may intervene in a Chapter 8 case. Any person intervening under this subdivision shall be deemed a party interest with the right to be heard on all matters in the case.
 (c) Permissive Intervention. The court may for cause shown permit any interested person to intervene generally or with respect to any specified matter in the Chapter 8 case.
 (d) Service on Intervenors. The court may enter orders governing the service of notice and papers on intervenors.
 
 
 [2]
 In its previous opinion denying intervention to PCC stockholders, the reorganization court did not base its decision on this distinction. Instead, the court stated that it had the discretion, in appropriate instances, to deny intervention even to shareholders of the debtor. See In re Penn Central Transportation Co., 328 F.Supp. 1273, 1275 (E.D.Pa.1971), Aff'd, per curiam, 455 F.2d 976 (3d Cir. 1972)
 
 
 [3]
 To whom the PCC distributes the shares it receives pursuant to the PCTC reorganization is not relevant here. That issue will be reached in the discussion of the appeals taken from the Chapter XI Court's orders
 
 
 [4]
 There was testimony before the reorganization court that the shares of common stock would be worth only $6 each. Appendix, Volume II, p. 130. The SEC estimated that the going-concern value of the reorganized company would be $600 million. Appendix, Volume I, Book 3, p. 1194. Under the plan forty million shares will be issued. Appendix, Vol. I, Book I, p. 26. This would indicate a value of $15 per share. Secured creditors are given one share of stock for every $44.55 of claim. Approval Opinion, 458 F.Supp. at 1285, n. 47. Thus it is obvious that the common stock must sharply appreciate before secured creditors are fully paid off. Appellants argue that the reorganized company was undervalued by the SEC and the reorganization court because of an undervaluation of certain coal holdings. Appellants point to no specific error in the SEC's valuation method or any evidence, either in the record or which they would like to introduce into the record, showing that a higher valuation is proper. The reorganization court specifically stated that the assertion that the coal assets were not properly valued "simply is not accurate." Approval Opinion, 458 F.Supp. at 1343. This is a factual finding and appellants have not shown it to be clearly erroneous. At any rate, unless the SEC valuation was very far off, any error in the valuation of coal assets would have little bearing on our analysis
 
 
 [5]
 The PCC directors state that the meetings have not been held because there are inadequate funds and because they were dependent on PCTC for the financial information necessary for proxy statements and that sufficiently current information was not received. Obviously, this would also explain the failure to send out annual financial statements. See Affidavit of Archibald Deb. Johnson and Alvin Friedman attached to PCC's motion for summary judgment. Appellants sought and were denied an adjournment of the hearing on confirmation of the plan of arrangement so that they could conduct discovery with respect to these issues. They now claim that the summary judgment should be reversed because of this denial. The inability to conduct such discovery, however, is not a basis for overturning the summary judgment order since the ability of PCC to hold a meeting or issue financial statements is not relevant, as discussed above, to the validity of PCC's vote in favor of the PCTC plan of reorganization. Since PCC is about to be dissolved pursuant to the plan of arrangement, there would be no need to order the holding of a shareholder meeting or the issuance of annual financial statements at the present time
 
 
 [6]
 Amended Plan of Reorganization for Penn Central Transportation Company, p. 23, Joint Appendix, Vol. I, Book 1, A-29
 
 
 [7]
 See Note 4, Supra
 
 
 [8]
 See id
 
 
 [9]
 Appellants have not claimed that the liquidation of the PCC pursuant to the plan of arrangement is prejudicial Per se. Liquidations pursuant to Chapter XI and Chapter X plans have been upheld where the circumstances so warrant. See, e. g., In re Northern Illinois Development Corp., 324 F.2d 104 (7th Cir. 1963), Cert. denied, 376 U.S. 938 (1964), (Chapter XI); In re V. Loewer's Gambrinus Brewery Co., 141 F.2d 747 (2d Cir. 1944) (Chapter X). The need to coordinate the PCTC plan with the PCC plan is adequate justification for allowing the liquidation here pursuant to a Chapter XI arrangement
 
 
 [10]
 The appellants intimate that the PCC reorganization should have proceeded under Chapter X rather than Chapter XI. See Appellants' Brief in No. 78-2336, p. 17. No absolute rule governs whether a reorganization should be accomplished under Chapter XI. See SEC v. American Trailer Rentals Co., 379 U.S. 594, 85 S.Ct. 513, 13 L.Ed.2d 510 (1965); General Stores Corp. v. Shlensky, 350 U.S. 462, 76 S.Ct. 516, 100 L.Ed. 550 (1956). There was no error in conducting the PCC proceedings under Chapter XI